Robert BLOUNT and Susan Blount, Plaintiffs,

v.

Richard REDMOND, in his official capacity as Commissioner of Education and Cultural Services for the State of Maine, Leon A. Duff, in his official capacity as Superintendent of Schools for School Union No. 52, Willard Sleamaker, Esther Bernhardt, Christine Bilodeau, Harvey Boatman and James Mitchell, in their official capacities as members of the Vassalboro School Committee, and David Crook, in his official capacity as the State of Maine's District Attorney for Kennebec County, Defendants.

Civ. No. 86–0266–B.

United States District Court, D. Maine.

Oct. 22, 1986.

---

Samuel W. Lanham, Cuddy and Lanham, Bangor, Me., for plaintiffs.

Peter J. Brann, Asst. Atty. Gen., Augusta, Me., for defendants.

## MEMORANDUM ORDER ON MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

CYR, Chief Judge.

Following oral argument on October 10, 1986, the court now issues this memorandum setting forth the facts and the conclusions of law upon which it relied for its earlier denial of plaintiffs' motion for preliminary injunctive relief.

### FACTS

The parties stipulated as follows:

1. The plaintiffs, Robert and Susan Blount, are born-again Christians who hold a religious belief that their children must be educated at home.

2. Maine law, Me.Rev.Stat.Ann. tit. 20–A, § 5001–A(1) (1985–86 Supp.), requires children between the ages of 7 and 17 to attend a public school during its regular annual session, unless the child qualifies for one of the specific exceptions or alternatives provided for by statute. One of those alternatives is that the child obtain "equivalent instruction in a private school or in any other manner arranged for by the school board directors and ... the equivalent instruction is approved by the Commissioner." Me.Rev.Stat.Ann. tit. 20–A, § 5001–A(3)(A)(1) (1985–85 Supp.). State law also provides for an appeal process from a local school board to the Commissioner if a request to provide equivalent instruction is denied. See Me.Rev.Stat. Ann. tit. 20–A, § 5001–A(3)(A)(2).

3. As noted by the Maine Supreme Judicial Court, sitting as the Law Court, this provision of Maine law recognizes the right

of parents to educate their children at home and "[i]t defends against abuse of that right by requiring that parents obtain the approval of school officials for home educational programs." *See State v. McDonough*, 468 A.2d 977, 979 (Me.1983). As authoritatively interpreted by the Maine Supreme Judicial Court, Maine law requires that parents obtain the prior approval of state education officials for home instruction programs (absent a valid Religion Clause constitutional claim to exemption, an issue not presented in *McDonough*).

4. Unless the absence from public school is attributable to one of the recognized statutory exceptions or alternatives, a child is an "habitual truant" if absent "for the equivalent of 10 full days, or for at least ½ day on 7 consecutive school days, within any 6–month period." *See* Me.Rev.Stat.Ann. tit. 20–A, § 5051(1)(B) (1985–86 Supp.).

5. Having control of a student who is an habitual truant and being primarily responsible for that truancy constitutes a civil violation. Me.Rev.Stat.Ann. tit. 20–A, § 5053(1)(A) (1985–86 Supp.). The provision prescribes a maximum fine of $200 as punishment for a violation, the fine being paid to local school authorities to support the public schools.

6. The Commissioner of the Department of Educational and Cultural Services has adopted guidelines which local school committees and school administrative districts are to use in adopting appropriate rules governing home instruction programs. (Defendants' Memorandum Exhibit A.)

7. Plaintiffs have not sought approval of their home instruction program, either by the local school board or by the Commissioner of the Department of Educational and Cultural Services, because they take the position that such prior approval conflicts with their religious beliefs. (The parties do not enter into any stipulation as to the nature of plaintiffs' religious beliefs, what those beliefs compel or permit with respect to the state's regulation of their home school, or the nature of plaintiffs' legal claims.)

8. The Commissioner has established guidelines for non-approved private schools, which guidelines are totally voluntary on the part of both the Commissioner and the non-approved private schools. (Defendants' Memorandum Exhibit B.)

9. The Guidelines for non-approved private schools were never intended to apply to home instruction programs. As a matter of state law and absent any valid constitutional objection, home instruction programs must meet with the prior approval of school officials. *McDonough*, 468 A.2d at 979. The guidelines for home instruction (Exhibit A) were promulgated pursuant to this requirement of state law.

10. Anticipating the commencement of an habitual truancy action against them, the plaintiffs, in a complaint dated September 26, 1986, initiated this action seeking temporary and permanent injunctive relief, and a declaratory judgment to prevent the District Attorney of Kennebec County from commencing a civil violation proceeding against them pursuant to Me.Rev.Stat. Ann. tit. 20–A, § 5053(1)(A) (1985–86 Supp.).

11. The plaintiffs' original application for a temporary restraining order was denied by this court on September 30, 1986. On October 2, 1986, the plaintiffs filed an amended complaint seeking temporary and permanent injunctive relief and a declaratory judgment, and renewed their application for a temporary restraining order.

12. At the time that both of these complaints were filed, the plaintiffs had not yet been served with legal process commencing truancy actions against them in the Maine District Court.

13. The plaintiffs have since been served with court summonses requiring them to appear on October 14, 1986 to answer a complaint against them charging them with civil violations under the habitual truancy provisions of Maine's compulsory school attendance laws. Me.Rev.Stat. Ann. tit. 20–A, § 5053. Thus, state pro-

ceedings have been commenced, but no appearance has as yet [the stipulation was signed October 10, 1986] been entered by parties or counsel.

14. The State of Maine has an interest in assuring that children within its jurisdiction have educational opportunities made available to them. The state also has an interest in children within its jurisdiction being educated, so that they may be prepared as adults to participate as citizens of the State of Maine and of the United States of America, and so that they do not become wards of the state. (The parties make no stipulation concerning the *legal* characterization of these interests as "compelling," "important," or "rational." The parties further enter into no stipulation with respect to the state's *specific* interest in the supervision, regulation and/or approval of home instruction programs.)

15. The various regulatory rules noted above (Defendants' Memorandum Exhibits A & B) are the means by which state officials implement and enforce the interests specified in paragraph 14.

The court further finds the following facts on the basis of the verified complaint and affidavits:

The controversy between the plaintiffs and the defendants arose during the 1985–86 school year, when plaintiffs' children were enrolled in the "satellite school system of Christian Liberty Academy, headquartered in Prospect Heights, Illinois." Lanham Affidavit, Attachment A, at 2. The Christian Liberty Academy satellite school program required plaintiffs' children "to attend their home school at least 185 days a year and complete a course of study prescribed by Christian Liberty Academy." *Id.*

Prior to the 1985–86 school year, plaintiffs had received a copy of the Vassalboro (Maine) School Committee's "Home Instruction Policy." Plaintiffs did not comply with this policy, however, but submitted, in August 1985, a letter purporting to comply with the "Guidelines for Equivalent Instruction in Non-Approved Private Schools." [1] In September 1985 the Department of Education and Cultural Services informed plaintiffs that the guidelines for non-approved private schools were not intended to be used as criteria for home instruction programs, and, therefore, that plaintiffs' request for non-approved private school status could not be approved. *Id.* at 3.

In March 1986, plaintiffs were informed that the Vassalboro School Committee would be proceeding with a truancy hearing, pursuant to Me.Rev.Stat.Ann. tit. 20–A, § 5051(2)(C).[2] Plaintiffs retained coun-

---

1. Plaintiffs followed the same procedure prior to the beginning of the 1986–87 school year, mailing a letter to the Department of Educational and Cultural Services which appeared to comply with the guidelines for non-approved private schools. *See* Affidavit of Robert and Susan Blount, ¶ 6.

2. Section 5051 provides in pertinent part:
 § 5051. Habitual truants
 1. Definition. A student is an habitual truant if the student is:
 A. Subject to section 5001–A; and
 B. Absent from school without excuse for the equivalent of 10 full days, or for at least ½ day on 7 consecutive school days, within any 6–month period.
 2. Procedure. The following provisions govern the procedure to be followed when a student is an habitual truant.
 A. If a principal of a public school determines that a student is an habitual truant, the principal shall inform the superintendent.

The superintendent shall first try to correct the problem informally.
 B. If unable to correct the problem informally, the superintendent shall refer the matter to the school board along with the principal's report and any other useful information.
 C. The school board shall call a hearing and shall notify the student's parent of the following in writing at least 7 days in advance:
 (1) Date and time of the hearing;
 (2) Purpose of the hearing;
 (3) The parent's right to inspect student's attendance records and principal's reports; and
 (4) The necessity of the parent's and student's presence at the hearing.
 D. If the school board determines that the student is an habitual truant, it shall either:
 (1) Instruct the student to attend school as required by section 5001–A and advise the parents of their responsibility under section 5001–A, subsection 5 to assure the student's attendance; or

sel and the truancy hearing was continued while discussions ensued between counsel and state and local officials. *See* Lanham Affidavit, Attachments B & C. The parties did not alter their positions and, on September 9, 1986, the Vassalboro School Committee voted (3–2) to refer plaintiffs' case to the district attorney for prosecution under the state truancy law.

Counsel for plaintiffs called the district attorney on September 17, 1986, and was informed that the district attorney intended to proceed "quickly." On September 26, 1986, plaintiffs initiated the instant suit by filing a verified complaint and a motion for temporary restraining order, accompanied by affidavits and a supporting memorandum.

By order dated September 30, 1986, the court denied plaintiffs' motion on the ground that it did not comply with Fed.R. Civ.P. 65(b).

On October 2, 1986, plaintiffs filed an amended complaint and a "renewed" motion for temporary restraining order. On October 3, 1986, plaintiffs were served with a summons and complaint commencing the aforementioned state court truancy proceeding. Due to a clerical error, plaintiffs' amended federal complaint and motion were not presented to this court until October 6, 1986.

## CONCLUSIONS OF LAW

Although denominated as a motion for a temporary restraining order, the motion states that plaintiffs do not wish to proceed without notice. As plaintiffs' counsel represented that all defendants had been served with the complaint and that all defendants had received notice of the renewed motion for temporary restraining order as of October 3, 1986, the court issued a scheduling order proposing to treat plaintiffs' renewed motion as a motion for preliminary injunctive relief, setting a time and date for hearing, and requesting supplemental briefing on specific issues. As no party objected,[3] the court treats plaintiffs' motion as a request for preliminary injunctive relief, rather than for a temporary restraining order.

The criteria for preliminary injunctive relief are well settled in the First Circuit:

> In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979), *quoted with approval in Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981); *see also Castro v. United States,* 775 F.2d 399, 407 (1st Cir.1985).

In ruling that plaintiffs are not entitled to preliminary injunctive relief, the court relied on two factors. First, notwithstanding the able argument advanced by plaintiffs' counsel, it appears that the doctrine of abstention announced in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), applies to the instant case, thus mandating dismissal. Accordingly, plaintiffs cannot demonstrate a likelihood of success on the merits in the present action. Second, plaintiffs have not established that they would suffer irrepa-

---

(2) Waive the requirements of section 5001–A, if the student is 14 years of age or older. Me.Rev.Stat.Ann. tit. 20–A, § 5051 (West Supp. 1985–86).

**3.** The scheduling order stated:
 If defendants contend that they are prejudiced by the short notice of this hearing, the court will hear argument and reconsider whether the instant motion should be considered as one for a temporary restraining order, *see generally* 11 Wright & Miller, *Federal Practice & Procedure,* § 7951 (1973).
Scheduling Order of October 7, 1986, at 2 n. 1. No party suggested prejudice or presented any argument on this issue at the hearing.

rable injury if the injunction were not granted.

## A. *Younger Abstention*

■ In the landmark decision of *Younger v. Harris, supra,* the Supreme Court refused to enjoin state criminal proceedings which the federal plaintiffs claimed had been brought pursuant to unconstitutional state statutes. In addition to citing the traditional reluctance of a court of equity to interfere with criminal prosecutions, the Court relied on considerations of comity and federalism:

> The doctrine [of abstention] may originally have grown out of circumstances peculiar to the English judicial system and not applicable in this country, but its fundamental purpose of restraining equity jurisdiction within narrow limits is equally important under our Constitution, in order to prevent erosion of the role of the jury and avoid a duplication of legal proceedings and legal sanctions where a single suit would be adequate to protect the rights asserted. This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of "comity," that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. This, perhaps for lack of a better and clearer way to describe it, is referred to by many as "Our Federalism," and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of "Our Federalism."

401 U.S. at 44, 91 S.Ct. at 750.

Although the holding of *Younger* applies only to criminal actions pending at the time the federal suit is filed, more recent Supreme Court decisions recognize that the principles of comity and federalism underlying *Younger* are applicable equally "to civil proceedings in which important state interests are involved." *Ohio Civil Rights Commission v. Dayton Christian Schools,* — U.S. ——, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986). As the Court stated in *Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982),

> The importance of the state interest may be demonstrated by the fact that the noncriminal proceedings bear a close relationship to proceedings criminal in nature, as in *Huffman [v. Pursue, Ltd.,* 420 U.S. 592, 604–605, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975)]. *Proceedings necessary for the vindication of important state policies* or for the functioning of the state judicial system also evidence the state's *substantial interest* in the litigation. *Trainor v. Hernandez,* 431 U.S. 434, [97 S.Ct. 1911, 52 L.Ed.2d 486] (1977); *Juidice v. Vail,* 430 U.S. 327, [97 S.Ct. 1211, 51 L.Ed.2d 376] (1977). Where vital state interests are involved, a federal court should abstain "unless state law clearly bars the interposition of the constitutional claims." *Moore [v. Sims,* 442 U.S. 415, 426, 99 S.Ct. 2371, 2379, 60 L.Ed.2d 994 (1979)]. "[T]he ... pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the constitutional claims...." *Id.,* at 430, 99 S.Ct. at 2380. See also *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

457 U.S. at 432, 102 S.Ct. at 2521 (emphasis added).

It is beyond dispute that an action by the state to enforce truancy laws is a proceeding "necessary for the vindication of important state policies." As the Supreme Court has recognized, "[t]here is no doubt as to the power of a state, *having a high responsibility for education of its citizens,* to impose reasonable regulations for the control and duration of basic education." *Wisconsin v. Yoder,* 406 U.S. 205, 213, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972) [emphasis added]. It is through the enforce-

ment of its truancy laws that a state vindicates its interest in insuring that all citizens receive an education. Thus, the state truancy proceeding which plaintiffs seek to have stayed, although denominated a civil proceeding, *see State v. McDonough,* 468 A.2d 977, 980 n. 5 (Me.1983), is clearly a proceeding "in which important state interests are involved," and therefore is a proceeding which implicates *Younger* concerns of comity and federalism.

Plaintiffs have not disputed the foregoing. Instead, plaintiffs argue that the doctrine of abstention announced in *Younger* should not apply in this case because no state action was pending at the time plaintiffs filed their federal action. As noted above, *Younger* itself applied only to cases in which a state proceeding was pending at the time the federal suit was filed. *See Younger,* 401 U.S. at 41, 91 S.Ct. at 749 ["We express no view about the circumstances under which federal courts may act when there is no prosecution pending in state courts at the time the federal proceeding is begun."].

In *Hicks v. Miranda,* 422 U.S. 332, 349, 95 S.Ct. 2281, 2291, 45 L.Ed.2d 223 (1975), however, the Court broadened its application of *Younger* abstention:

> Neither *Steffel v. Thompson,* 415 U.S. 452, [94 S.Ct. 1209, 39 L.Ed.2d 505] (1974), nor any other case in this Court has held that for *Younger v. Harris* to apply, the state criminal proceedings must be pending on the day the federal case is filed. Indeed, the issue has been left open; *and we now hold that where state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court,* the principles of *Younger v. Harris* should apply in full force.

*Id.* (emphasis added, footnote omitted). In *Hicks,* the federal plaintiff had been charged in a criminal action begun the day *after* the federal defendants (including the prosecutor of the criminal charge) were

served with the federal summons and complaint.

Plaintiffs argue that the actual holding of *Hicks* is narrower than the language of the opinion, that *Hicks* may be distinguished by its unique facts, and that no Supreme Court decision since *Hicks* has applied *Younger* in a factual setting analogous to the present.

Although *Hicks* did present a unique set of facts, there is nothing in the opinion to suggest that its holding is only appropriate in that particular context. *Hicks* involved a state-court ordered seizure and prosecution under state anti-obscenity laws. In November 1973, police seized four copies of a movie which was being shown at the Pussycat Theatre in Buena Vista, California. Two days after the seizure the theatre employees were charged in Municipal Court with misdemeanors under state law. On the same day, the Superior Court ordered Miranda, the theatre owner, to show cause why the seized movie should not be declared obscene. On the next day, November 27, the Superior Court held a hearing, viewed the movie, and ruled that the movie was obscene. The judgment was not appealed.

On November 29, 1973, Miranda filed suit in federal district court, requesting a temporary restraining order, preliminary injunctive relief, and a judgment declaring the state obscenity statute unconstitutional. On December 28, 1973, after considering affidavits and exhibits submitted by both parties, the federal district court denied the application for a temporary restraining order. *See* 422 U.S. at 353–54 n. 1, 95 S.Ct. at 2293–94 n. 1 (Stewart, J., dissenting). On January 8, 1974, a three-judge federal district court was convened to consider the constitutionality of the state statute. On January 14, 1974, service of the complaint was completed on all defendants. On the next day, the criminal complaint pending in Municipal Court was amended to add the name of Miranda, as theatre owner, and to add two conspiracy counts. *See* 422 U.S. at 335–39, 95 S.Ct. at 2285–86.

The district court rejected the argument that *Younger* required abstention. The Supreme Court reversed, citing two reasons warranting *Younger* abstention. First, the Court noted that though no criminal charges were pending against Miranda at the time he filed his federal suit, his interests were "intertwined" with the interests of his employees, against whom criminal charges *were* pending, and that it appeared that Miranda's interests could be vindicated by defending the criminal charges brought against the employees. *Id.* at 348–49, 95 S.Ct. at 2291. Second, in the language quoted above, the Court held that *Younger* principles should apply "where state criminal proceedings are begun after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court." *Id.* at 349, 95 S.Ct. at 2291.

Plaintiffs emphasize that, in *Hicks*, a judgment already had been entered against the federal plaintiff and that the federal plaintiff's interests were intertwined with those of his employees, against whom criminal charges were pending. Thus, proceedings of substance had occurred in *state* court, and it appeared that the federal plaintiff was attempting to get "two bites at the apple." Moreover, as the federal plaintiff in *Hicks* was named in an *amended* criminal charge, plaintiffs argue that the complaint "relates back" to the time the charge was originally filed in state court (which was *prior* to the filing of the federal complaint). Thus, plaintiffs characterize *Hicks* as an "aberrant case of attempted circumvention of *Younger*" which should not control the outcome of the present case.

Plaintiffs' arguments would have more force if *Hicks* could be considered in isolation from later decisions of the Court. In at least two decisions announced since *Hicks*, however, the Court has made it clear that the *Hicks* holding is not limited to its own unique facts.

Most recently, in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 102 S.Ct. 2515, 73

L.Ed.2d 116 (1982), the Court implicitly reaffirmed the holding that *Younger* applies provided the state court proceeding is commenced before there are any "proceedings of substance on the merits" in the federal action. In *Middlesex*, an attorney was charged with violations of the Code of Professional Responsibility. The procedure for attorney discipline in New Jersey provides a three-step process for handling complaints against attorneys, ending with review by the New Jersey Supreme Court. The attorney in *Middlesex* was charged with code violations. Rather than responding to the charges at this first step in the disciplinary process, the attorney filed suit in federal court, challenging the constitutionality of the disciplinary rules. The Third Circuit held that *Younger* principles did not apply because the disciplinary proceedings did not provide a meaningful opportunity to adjudicate constitutional claims. On petition for rehearing, an affidavit was submitted indicating that the New Jersey Supreme Court would hear the constitutional challenges and that it would consider adopting procedures to provide for judicial consideration of constitutional challenges in all attorney discipline cases. *See* 457 U.S. at 425–31, 102 S.Ct. at 2517–20.

In reversing the Third Circuit and holding that *Younger* was applicable, the Court relied on its previous holding in *Hicks:*

> Whatever doubt, if any, that may have existed about respondent Hinds' ability to have constitutional challenges heard in the bar disciplinary hearings was laid to rest by the subsequent actions of the New Jersey Supreme Court. Prior to the filing of the petition for certiorari in this Court the New Jersey Supreme Court *sua sponte* entertained the constitutional issues raised by respondent Hinds. Respondent Hinds therefore has had abundant opportunity to present his constitutional challenges in the state disciplinary proceedings.

> There is no reason for the federal courts to ignore this subsequent development. In *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975),

we held that "where state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in federal court, the principles of *Younger v. Harris* should apply in full force." *Id.*, at 349, 95 S.Ct. at 2291. An analogous situation is presented here; the principles of comity and federalism which call for abstention remain in full force. Thus far in the federal-court litigation the sole issue has been whether abstention is appropriate. No proceedings have occurred on the merits and therefore no federal proceedings on the merits will be terminated by application of *Younger* principles. It would trivialize the principles of comity and federalism if federal courts failed to take into account that an adequate state forum for all relevant issues has clearly been demonstrated to be available prior to any proceedings on the merits in federal court. 422 U.S., at 350, 95 S.Ct. at 2292.

457 U.S. at 436–37, 102 S.Ct. at 2523–24 (footnotes omitted).

Moreover, contrary to plaintiffs' assertions, the Court has held that *Younger* principles apply in a fact setting indistinguishable in all material respects from the present case. In *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), decided six days after *Hicks*, three corporations that operated bars sought to challenge a local ordinance proscribing topless dancing. The ordinance was enacted on July 17, 1973, and the three corporations complied with the ordinance. However, on August 9, 1973, the three corporations filed suit in federal court, alleging that the ordinance violated their constitutional rights and seeking a temporary restraining order, preliminary injunctive relief, and declaratory relief. *See* 422 U.S. at 924–25, 95 S.Ct. at 2564.

The request for a temporary restraining order was denied on August 9. On August 10, one of the three corporations, M & L Restaurant, Inc., resumed its presentation of topless dancing, and on that day "and each of the three succeeding days, M & L and its topless dancers were served with criminal summonses based on violations of the ordinance." *Id.* at 925, 95 S.Ct. at 2564 (footnote omitted). The other two corporations did not resume their presentations of topless dancing until after the district court preliminarily enjoined enforcement of the ordinance.

The district court and the Second Circuit held that *Younger* did not require abstention on any of the claims of the three corporations. Both courts recognized that M & L stood in a somewhat different posture than the other federal plaintiffs as a result of the state criminal charges which had been brought one day after the filing of the federal suit. As summarized by the Supreme Court, the Second Circuit nevertheless "concluded that the interests of avoiding contradictory outcomes, of conservation of judicial energy, and of a clearcut method of determining when federal courts should defer to state prosecutions, all militated in favor of granting relief to all three [federal court plaintiffs]." 422 U.S. at 926–27, 95 S.Ct. at 2565.

The Supreme Court rejected the notion "that all three plaintiffs should automatically be thrown into the same hopper for *Younger* purposes." *Id.* at 928, 95 S.Ct. at 2566. Although the Court recognized that there may be some circumstances "in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them," *id.*, the three corporations in *Doran* did not present such a case.

Considering each corporation separately, the Court held that *Younger* applied to M & L:

Respondent M & L could have pursued the course taken by the other respondents after the denial of their request for a temporary restraining order. Had it done so, it would not have subjected itself to prosecution for violation of the ordinance in the state court. *When the criminal summonses issued against M & L on the days immediately following the filing of the federal complaint, the*

*federal litigation was in an embryonic stage and no contested matter had been decided. In this posture, M & L's prayer for injunction is squarely governed by Younger.*

422 U.S. at 929, 95 S.Ct. at 2566 (emphasis added).

■ In *Doran,* as in the present case, there were no state court proceedings pending *prior* to the filing of the federal law suit, and yet the subsequent initiation of a state court proceeding, while the federal action was in an "embryonic" stage, was sufficient to require abstention under *Younger.* Indeed, the present case presents a stronger argument for abstention than the case of M & L in *Doran.* Although no state *judicial* proceedings were pending at the time of the filing of the present federal action, local administrative proceedings had been convened with a view to the initiation of truancy proceedings in state court against the plaintiffs. The documents submitted by plaintiffs and the stipulated facts make it clear that plaintiffs brought suit in this court only after they had been unsuccessful in obtaining relief at the administrative level. Rather than presenting a case in which there was no state action prior to the filing of a federal suit, plaintiffs seek to involve the federal court in an ongoing dispute next to be continued in a state court.[4] As plaintiffs brought this suit in anticipation of the commencement of a state court action

against them and as the state court suit in fact was commenced one week after the filing of the federal suit, the message of *Middlesex, Hicks* and *Doran* is that *Younger* abstention applies to the present injunctive action.[5]

■ Plaintiffs' final argument against *Younger* abstention is that extraordinary circumstances require that this court exercise its jurisdiction. Specifically, plaintiffs contend that the inadvertent delay by federal court clerical personnel in presenting the court with plaintiffs' renewed motion for a temporary restraining order created the *Younger* abstention problem, inasmuch as no state court proceeding had been commenced by the time the renewed motion was filed:

> The difficulty now facing the Court (and for which it may have granted extra time for filing of further materials) is the abstention problem created by the filing by the State of its state civil action *between* the time when Plaintiffs reapplied for a TRO and when the Court was first made aware of such reapplication. In this regard, it should be remembered that one of the circumstances which the Supreme Court has repeatedly stated to be an exception to the Younger principle is the existence of "some other extraordinary circumstance that would make abstention inappropriate," *Middlesex,* 457 U.S. at 435, 102 S.Ct. at 2522, or "other

---

4. In this regard, it can be argued that the facts of the present case are closer to those presented in *Middlesex,* in which the federal plaintiff sought to halt the state proceedings after administrative proceedings had started, but prior to judicial review. *See* 457 U.S. at 425–32, 102 S.Ct. at 2518–20.

5. *Hicks, Doran* and *Middlesex* refute plaintiffs' suggestion that the application of *Younger* principles to this case would be "unprecedented." Although this particular question has not been extensively litigated, *see generally* 17 Wright, Miller & Cooper, *Federal Practice and Procedure,* § 4253, at 562–65 (1978 & Supp.1986), under similar facts other courts have found *Younger* applicable. *See, e.g., People v. Archer Daniels Midland Co.,* 704 F.2d 935, 940 (7th Cir.1983) [notwithstanding contention that state law is preempted, state prosecutor may proceed under state law without fear of an injunction, as

*Younger* applies even if federal suit is begun prior to any state proceeding: "It is not the order of the suits that is important, but whether a state statute has been violated: if so, and the state prosecutes, the violator can challenge its constitutionality only by way of defense to the criminal proceeding."]; *Gannett Satellite Information Network Inc., v. Town of Norwood,* 579 F.Supp. 108, 112–13 (D.Mass.1984) [*Younger* applies where municipality has *requested* a criminal complaint against the federal plaintiff, notwithstanding that a criminal proceeding is not formally commenced until a complaint issues]; *Ziegman Productions Inc. v. City of Milwaukee,* 496 F.Supp. 965, 968–69 (E.D.Wisc.1980) [under *Younger* and *Hick,* abstention is appropriate where it appears that the federal plaintiff will be facing criminal charges the day following the filing of the federal lawsuit].

unusual circumstance that would call for equitable relief." *Younger*, 401 U.S. at 54, 91 S.Ct. at 755.

Plaintiffs' Response to Scheduling Order, at 10–11.

The argument is without merit. Aside from the fact that the circumstances which courts have found to be "extraordinary," so as to warrant an exception to the *Younger* doctrine, are exceedingly narrow, *see generally* 17 Wright, Miller & Cooper, *Federal Practice and Procedure*, § 4255 (1978 & Supp.1986), and cases cited therein, the brief delay which occurred here does not alter the calculus as to the appropriateness of *Younger* abstention. Underpinning plaintiffs' entire argument in this regard is the erroneous assumption that *Younger* abstention depends upon which of the parties won the race to the courthouse. There is no basis for such an assumption in the context of the present case. Plaintiffs' original complaint and motion for temporary restraining order made it plain that this federal action was brought in reaction to the "threatened" commencement of truancy proceedings in state court. As the foregoing discussion of *Younger* and its progeny indicates, such a complaint implicates *Younger* considerations even prior to the actual initiation of any state proceeding to the extent that it appears that the federal court plaintiff is seeking to involve the federal court in either an incipient or an ongoing state proceeding.[6] Thus, the circumstance of the actual service of the state court complaint upon the plaintiffs is of marginal significance, as plaintiffs' federal complaint and motion for injunctive relief implicated *Younger* considerations notwithstanding the fact that the state court proceeding had not yet been commenced.

Plaintiffs' argument also fails because it assumes that if the court had received the renewed motion on the day of its filing, it would have heard the motion and granted it that day. Neither assumption is supportable. The renewed motion emphasizes that plaintiffs did not wish to proceed *ex parte*. Thus, the earliest possible hearing date would have been October 3, the date plaintiffs were served, and it is highly improbable that a hearing would have been held that day.[7]

Yet more fundamentally, the court could not have granted the temporary restraining order even assuming that *Younger* abstention issues had not loomed so large. As the court stated in its first order denying plaintiffs' application for a temporary restraining order, and as further elaborated below, plaintiffs have not at any time met their burden of showing a threat of irreparable injury.

Had plaintiffs' renewed motion been presented to the court in a timely fashion, a hearing would have been scheduled for a time *after* plaintiffs had been served with the state court complaint, which is precisely what occurred with the delay. Alternatively, an immediate hearing on plaintiffs' renewed motion would have resulted in denial of the request for a temporary restraining order. Service of the state summons and complaint the next day would have placed the present proceeding in a posture identical to *Hicks* and *Doran*, in which state proceedings began *soon after* the filing of the federal complaint and the denial of the federal plaintiff's request for a temporary restraining order, but *before* any substantial federal litigation on the merits. It simply cannot be said that the delay in presenting plaintiffs' amended

---

**6.** In this case there is no question that it was the impending state court truancy proceeding which spurred plaintiffs to file their federal complaint. Plaintiffs' arguments against the application of *Younger* are an attempt to resurrect the "race to the courthouse" rejected in *Hicks*. *See* 422 U.S. at 349, 95 S.Ct. at 2291; *cf.* 422 U.S. at 354, 95 S.Ct. at 2294 (Stewart, J., dissenting).

**7.** Because questions of abstention were apparent from the outset, barring some new allega-

tion of immediate and irreparable injury the court did not plan to hear argument without first requiring the parties to address the abstention issues. Also, the court takes judicial notice of its schedule and that October 3 previously had been scheduled for criminal matters (sentencing and change of plea hearings) which were expected to occupy the court for the entire day.

complaint and renewed motion to the court constitutes an "extraordinary circumstance" warranting exemption from *Younger.*

The court reserves decision on defendants' *motion to dismiss* on *Younger* grounds, in order that plaintiffs may have the usual opportunity to respond should they wish to supplement the arguments already presented. *See* Local Rule 19. For the purpose of plaintiffs' motion for preliminary injunctive relief, however, the court is satisfied that *Younger* abstention applies.[8] Therefore, as a matter of law plaintiffs have not demonstrated a likelihood of success on the merits of their claim for injunctive relief.

### B. *Irreparable Injury*

 In addition to the problem of *Younger* abstention, the court found, on the bases of their submissions, including their verified complaints and affidavits, that plaintiffs had not established that they would be subjected to irreparable injury, much less immediate irreparable injury, if their request for injunctive relief were not granted.[9]

---

8. Aside from the timing of the state and federal proceedings, plaintiffs have advanced no other arguments against applying *Younger.* Thus it plainly appears that the three-part test set forth in *Middlesex* for determining whether *Younger* should apply is satisfied in this case: the pending state proceedings are judicial, they implicate important state interests, and there is an adequate opportunity to raise constitutional challenges in the state proceeding. *See* 457 U.S. at 432, 102 S.Ct. at 2521; *Marcal Paper Mills, Inc. v. Ewing,* Civ. No. 83–274–B at 7 (unpublished opinion, D.Me. August 27, 1985), *aff'd on other grounds,* 790 F.2d 195 (1st Cir.1986).

9. In a subsequent filing with the court, plaintiffs suggest that it was "plain error" for the court to deny plaintiffs' request to present evidence at the hearing and, therefore, that the court cannot make findings of fact on the question of injury. Notwithstanding that the court's scheduling order clearly stated that the court would "hear *counsel* for the parties," Scheduling Order of October 7, 1986, at 2 (emphasis added), and that the Scheduling Order and the previous order denying plaintiffs' motion for a temporary restraining order made it plain that there were substantial *legal* hurdles facing plaintiffs' mo-

The gravamen of plaintiffs' complaint is that state enforcement of the requirement that their home education program be state approved before being considered "equivalent" to public education for purposes of the state truancy law, "contravenes plaintiffs' parental rights and religious liberties...." Amended Complaint, ¶ 4. Plaintiffs refer specifically to the "threat of prosecution" under the truancy law for the operation of their "home school":

> Plaintiffs received a copy of a letter dated September 16, 1986 ... from Defendant Superintendent of School LEON A. DUFF (hereinafter "DUFF") in which Superintendent DUFF informed Plaintiffs that he was "referring the matter ... to the District Attorney's office." By letter of September 15, 1986 ... Superintendent DUFF referred to Defendant District Attorney DAVID CROOK (hereinafter "CROOK") "the issue of truancy of the BLOUNT's children who are being educated at home." Immediately thereafter, on September 17, 1986, Plaintiffs' counsel, SAMUEL W. LANHAM, JR., was informed by District Attorney CROOK that he (CROOK) would "quickly" be instituting truancy proceedings against Plaintiffs. Such actions now di-

---

tion, plaintiffs arrived at the hearing ready to present the testimony of several witnesses. It is within the court's discretion whether to hear evidence on a motion for preliminary injunctive relief:

> Even if a party desires to present testimony, several federal courts have held that when there is no factual controversy the trial court has discretion to issue an order on written evidence alone, without a hearing. Similarly, preliminary injunctions are denied without a hearing, despite a request therefor by the movant, when the written evidence shows the lack of a right to relief so clearly that receiving further evidence would be manifestly pointless.

11 Wright & Miller, *Federal Practice and Procedure,* § 2949 at 478 (1973) [footnote omitted]. In this case there was no conflict in the affidavits. Because of the absence of factual dispute relevant to the substantial legal issues scheduled for oral argument, particularly the *Younger* abstention issue, and for reasons of judicial economy, the court determined that it would not hear witnesses.

rectly and immediately threaten the constitutional liberties of Plaintiffs and their children under the Religious Clauses of the First Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

Amended Complaint, ¶ 3.

Plaintiffs allege that they are suffering two forms of "immediate and irreparable" harm. First, plaintiffs contend that the policies of defendants constitute an "immediate, present and actual deprivation of plaintiffs' constitutional rights ... inasmuch as [the policies] have placed and continue at present to place substantial pressure on plaintiffs to modify their behavior and thereby violate their sincerely-held religious beliefs." *Id.,* ¶ 25. The second form of injury alleged is that "the state's threatened commencement of truancy proceedings has [ ] ... further chilled the exercise by plaintiffs of their constitutional rights under the First, Ninth and Fourteenth Amendments to the United States Constitution because of the fear that exercise of those rights will subject them to prosecution and civil punishment." *Id.*

The first injury alleged: an unconstitutional deprivation of plaintiffs' rights presently being caused by "substantial pressure" placed on them to modify their behavior, simply does not fit the undisputed facts of this case. This is not a situation like that considered in *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), where

> a refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding.

*Id.* at 462, 94 S.Ct. at 1217. In the present case, before the initiation of any court proceeding plaintiffs chose the Scylla of noncompliance with the state policy requiring approval of their home education program, thereby enmeshing themselves in concomitant state proceedings for the enforcement of that same state policy. Having made the choice to go forward with their unapproved home education program, plaintiffs cannot now be heard to complain in federal court that the *mere existence* of the state policy on prior home education program approval deprives them of their constitutional right to educate their children at home without state approval.

As to the second form of injury alleged by plaintiffs, the Supreme Court consistently has held that it does not constitute irreparable injury. As the Court noted in *Younger:*

> Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered "irreparable" in the special legal sense of that term. Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution.

401 U.S. at 46, 91 S.Ct. at 751. In affirming the district court's denial of preliminary injunctive relief in a case in which a store owner alleged that a town law violated his first and fourteenth amendment rights, the First Circuit stated that

> we believe that the issue—even in a First Amendment case—is one of proper exercise of the district court's discretion, and we cannot say that that discretion was abused. First, the sole "irreparable injury" that appellant alleged as a reason *for* granting the injunction, namely, the threat of imminent state prosecution, ordinarily militates *against* the issuance of a federal injunction. In *Younger* the Supreme Court wrote that both traditional equity jurisprudence and considerations of federal-state comity mean that "[c]ertain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." 401 U.S. at 46, 91 S.Ct. at 751. And, in *Doran,* the

Court made clear that the considerations referred to in *Younger* remain relevant, although the comity consideration is not determinative, when the state prosecution is threatened but has not yet begun. *Rushia v. Town of Ashburnham,* 701 F.2d 7, 9 (1st Cir.1983).

Plaintiffs seek to distinguish *Rushia* on the ground that the sole injury alleged in *Rushia* was the threatened prosecution, whereas plaintiffs in this case allege that they are being deprived of their constitutional rights by virtue of the pressure imposed by the state to modify their behavior. This distinction was important in *Rushia,* however, only because state prosecution was threatened, rather than pending:

> While the Supreme Court has stated that "the loss of First Amendment freedoms" constitutes "irreparable injury," in the context of a case involving loss of employment, *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976), it is clear that an injunction against a state criminal prosecution presents a different case. Nothing in *Elrod* suggests an intent to overrule *Doran.* *And the difference in the cases is probably explained by the presence of Younger-type comity considerations when the requested injunction is to run against an imminently threatened state prosecution.* Regardless, here Rushia did not claim in the district court that his "irreparable injury" consisted of the threat to his First Amendment right to display and sell certain magazines; rather, his sole claim was that the "injury" consisted of the threatened state prosecution. This is not necessarily an inadvertent omission, for Rushia may intend to continue to display and to sell his magazines until he is prosecuted. Certainly there is no evidence in the record that either the threat of prosecution or the actual prosecution altered his behavior. *Finally, and perhaps most importantly, the district court took into account the First Amendment problem in stating that, if there is no state prose-cution soon forthcoming, it will address the declaratory judgment request.* 701 F.2d at 10 (emphasis added).

Thus, the situation presented in *Rushia* was similar to that in *Steffel,* in which the *threat* of prosecution might deprive the plaintiff of his constitutional right by forcing the individual to choose between foregoing his putative rights or facing prosecution. *Rushia* differs from *Steffel,* however, in that there was no evidence "that either the threat of prosecution or the actual prosecution [Rushia had been prosecuted and acquitted prior to bringing his federal action] altered his behavior." 701 F.2d at 10. Like *Rushia,* there is no evidence that the threat of prosecution has altered plaintiffs' behavior. Unlike *Rushia,* a state proceeding has commenced in this action and there is no doubt that plaintiffs will be able to present and fully argue their constitutional claims in the state court proceeding. Indeed, plaintiffs so concede.

Thus the issue of irreparable injury is narrow in the procedural posture of this case. As the court noted at oral argument, plaintiffs' assertion of irreparable injury boils down to a claim that they will be irreparably injured if they are forced to vindicate their constitutional claims in state court rather than federal court. This argument has been foreclosed by *Younger* and its progeny. And the court discerns no other contentions of irreparable injury.

## CONCLUSION

For the foregoing reasons the court finds that plaintiffs have not met their burden of showing a likelihood of success on the merits of their claim for injunctive relief or that they will suffer irreparable injury if preliminary injunctive relief is denied. Therefore, plaintiffs' motion for a preliminary injunction is DENIED.

SO ORDERED.